# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00855-COA

LINCOLN DILLE A/K/A LINCOLN DILLE II                    APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE

DATE OF JUDGMENT:              04/15/2019
TRIAL JUDGE:                   HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED:     HINDS COUNTY CIRCUIT COURT,
                               FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                               BY: MOLLIE MARIE McMILLIN
                               LINCOLN DILLE (PRO SE)
ATTORNEYS FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                               BY: ASHLEY LAUREN SULSER
DISTRICT ATTORNEY:             JODY EDWARD OWENS II
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 08/24/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Lincoln Dille appeals his first-degree murder conviction for the 2014 shooting and death of Kanisky Lacey. Dille's first trial in 2018 ended in a mistrial when the jury could not reach a verdict. He was retried in April 2019 and convicted. On appeal, Dille's appointed counsel raised several issues. Dille himself filed a supplemental brief pro se raising other issues. After a review of the record and arguments of the parties, we affirm Dille's

1

conviction and sentence of life imprisonment.

**Facts**

¶2.     In December 2013, Dille moved into an apartment with his girlfriend, Rosemary Johnson, in Jackson, Mississippi. Johnson had been in previous relationships, including one with Lacey, with whom she had a child. When Johnson and Lacey's relationship ended, Johnson moved on, but Lacey harbored ill feelings. Lacey resented Johnson's subsequent boyfriends and threatened both Dille and Arcola, Johnson's boyfriend before Dille. After several threatening encounters with Lacey, Dille secured a peace bond and bought a gun to protect himself.

¶3.     On February 18, 2014, Johnson and Dille went to a gas station where Lacey had insisted she meet him to exchange custody of their two-year-old child. There the fatal shooting occurred. A security camera from the gas station captured the incident, but the video had no audio. The tape shows Johnson and Dille parking her vehicle near the street, away from the store and the gas pumps. Johnson was driving, and Dille was in the passenger seat. Lacey drove up in his car and parked across the front of Johnson's car, about three to four feet away. Lacey got out of the driver's side of his car, facing Johnson's car, and opened the back door on the same side where the child was sitting in a car seat. Simultaneously, Dille exited Johnson's car, holding a gun by his side, and started to walk toward the store. The video shows that Lacey looked at Dille and started to speak to him. Dille looked back at Lacey who was approximately ten to fifteen feet away. The two exchanged words while Dille paced, still at a distance. Lacey gestured, pointing to Johnson's

2

car. Dille rushed about four steps toward Lacey, pointing his gun at Lacey. But then Dille lowered the gun and backed off. Seeing this, Lacey leaned into the back of his car with his body facing forward and gestured toward Dille with his outside hand, as if he was pointing at Dille. As Lacey leaned in, Dille rushed forward and shot Lacey eight times. Dille was about three to four feet from Lacey when Dille killed him. At this point, Johnson got out of her vehicle and ran to Lacey. She heard Lacey say to Dille, "Why did you shoot me?" Johnson, obviously hysterical, ran back behind her car and then toward another car in the parking lot. Dille continued to pace until the police arrived, moments later, at which time Dille lowered himself, face first, to the ground. The time between Lacey's arrival and the shooting was less than a minute. The police arrived about forty-five seconds after the shooting and placed Dille under arrest. Dille told the officer that he had a peace bond and that he shot Lacey in self-defense.

¶4. Dille was indicted on April 24, 2014, on charges of first-degree murder in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2013) and shooting a firearm into a vehicle in violation of Mississippi Code Annotated section 97-25-47 (Rev. 2006). The indictment also noted that Dille used a firearm during the commission of a felony. Because of his indigent status, Dille was appointed counsel from the public defender's office. On June 20, 2014, Dille requested discovery, a speedy trial, and a plea offer. On June 30, 2014, Dille was arraigned and pleaded not guilty. His trial was set for December 8, 2014.

¶5. Dille was not tried until June 2018. In the interim, the record reflects that in October 2014, when his attorney left the public defender's office, the circuit court appointed Dille

3

another attorney and Dille's trial was continued "to the next criminal term."[1] On May 13, 2016, Dille moved to continue the trial due to outstanding discovery. During its investigation of the crime scene, Jackson Police Department (JPD) detectives confiscated three cell phones. On May 18, 2016, Dille moved for funds to employ an expert in cell phone data retrieval. Dille's trial was reset for July 25, 2016. Dille also filed a motion to set bail. No order was entered on these motions.

¶6.     The case was reset for December 13, 2016, and at that time, the circuit court continued the trial because "defendant needs to get order for defense funding signed to get an expert."

¶7.     There were several other motions and orders before the case was finally reset for trial to begin on June 11, 2018.[2] Dille filed several pre-trial motions, including motions in limine

---

[1] The next entry in the docket was nearly two years later on May 6, 2016. At that time, Dille's counsel filed a motion to compel discovery. It recited that Dille had received "some discovery" including police reports, witness statements, and video surveillance, but other items had not been disclosed. Dille also filed a motion to compel a recording of a 911 call made earlier in the day of February 18, 2014, concerning a disturbance that Lacey was making at Dille and Johnson's apartment.

There was no explanation for the eighteen-month lack of movement of the case between October 2014 and May 2016. But at some time, the trial was set for May 13, 2016. No motion to dismiss for lack of a speedy trial was ever filed.

[2] In July 2017, Dille sent a letter to his attorney, asking him to file a motion to dismiss based on Lacey's violation of the peace bond. On August 4, 2017, Dille filed the motion pro se. On August 23, 2017, the circuit court signed an agreed order continuing Dille's trial from September 3, 2017, to "the next term" because Dille's counsel would be out of the office on paternity leave. On October 5, 2017, the circuit court set the case for a status conference on April 24, 2018, and for trial on June 11, 2018.

The State refused to produce the cell phones that Dille requested until Dille provided the name of his expert, which prompted Dille's filing another motion for bail and for production in October 2017. In November 2017, the circuit court ordered the production

4

to exclude autopsy photographs; to order the State to refrain from referring to Lacey as a "victim"; to depose the State's expert from the Mississippi Analysis and Information Center of the Mississippi Office of Homeland Security who did a forensic search of the cell phones confiscated; to order the production of the recording of the 911 call; and to exclude the store surveillance video. The State moved to exclude toxicology evidence obtained during Lacey's autopsy, to exclude evidence of Lacey's prior criminal record, and to exclude evidence of how long Dille had been incarcerated prior to trial. The circuit court ordered the production of the 911 recording, but the record does not contain rulings on the other motions.

¶8.     Dille's trial, which began on June 11, 2018, ended in a mistrial on June 14, 2018, because the jury could not agree on a verdict. Thereafter, the circuit court reduced Dille's bail to $50,000.[3] The State chose to continue prosecuting the case, and a retrial was set for November 13, 2018. Because Dille was unable to secure the transcript of the first trial by that date, the circuit court continued his trial and reset it for April 8, 2019.

¶9.     Prior to Dille's second trial, he filed several motions, including a motion to preclude the State from calling "surrogate medical examiners" to testify who were not present at

---

of the cell phones, and in December 2017, the court authorized payment for Guardian Digital Services, Dille's cellphone expert. There being no ruling from the circuit court on Dille's motion for bail, Dille filed a petition for writ of mandamus with the Mississippi Supreme Court on March 8, 2018. On March 22, 2018, the circuit court set Dille's bond at $400,000.

[3] Although Dille later filed a motion to reduce bond further, he was able to post the $50,000 bond at the end of August 2018.

Lacey's autopsy.[4] The State filed the same pre-trial motions that it had filed in the first trial. The State added a motion requesting the court to allow Johnson to testify to Lacey's last words, which the court had excluded in the first trial. The State also moved to exclude any questioning of Officer Lincoln Lampley concerning any pending investigations of him on an administrative matter.

¶10. On March 28, 2019, and April 8, 2019, the circuit court heard arguments on these motions. The circuit court denied the defense's motions to exclude the store surveillance video and to prevent Dr. Mark LeVaughn from testifying.[5] The circuit court granted the State's motion to exclude any questions to Officer Lampley about his administrative leave. The court also allowed Officer Lampley to testify as to his observations that the child was

---

[4] Other motions included motions to exclude Lacey's mother from testifying in the State's case-in-chief; to restrain the State from making statements about religion (because in its closing argument in the first trial, the prosecutor made a reference to what Sunday school teachers teach); to preclude the State from questioning or arguing that Lacey had a right to object to Johnson's exposing his child to a "stream of men" as the State did in the first trial; to preclude the State from making any "send-a-message" argument that Dille felt the State had attempted to do in his first trial. Dille challenged the State's comments during closing argument that Dille should be held accountable for taking Keisha Lacey's only son, saying, "[I]f you can kill someone for mere words, the streets would be littered with bodies." Dille also moved to exclude photographs of the deceased taken at the scene and to preclude Officer Lincoln Lampley from testifying that the minor child and her car seat were "covered in blood," when there was physical evidence to the contrary, and to preclude him from testifying to the child's reaction to the shooting.

[5] The circuit court also granted Dille's motion concerning references to religion and comments on Johnson's parenting style. The court agreed that comments that Dille killed Keisha Lacey's only son and any other send-a-message argument would not be allowed. Concerning Lacey's mother, the court ruled that she could testify but only to information of which she had personal knowledge. The court ruled that the term "victim" could be used if the reference is to the "alleged" victim or decedent.

covered in blood. The court also ruled that Johnson could testify about what Lacey said to Dille in his dying breath ("Why did you shoot me?").

¶11.    Dille's second trial began on April 9, 2019. After extensive questioning by both the State and the defendant during voir dire, the circuit court excused a number of potential jurors for cause. Thereafter, when the State used ten peremptory challenges, all of which struck black jurors, Dille raised a *Batson* challenge.[6] In response, the State presented various reasons for its strikes, which the court accepted.

¶12.    The State called as witnesses Detective Daryl Owens, Investigator Mamie Barrett, Dr. Mark LeVaughn, and Officer Lincoln Lampley. Through Detective Owens, the State entered the surveillance video as evidence, which was shown to the jury several times. Owens had arrived on the scene after the shooting and spoke to Dille, who said that he shot Lacey because he (Dille) was scared. Dille also told Owens that Lacey had previously threatened him and that he had obtained a peace bond against Lacey. Owens said no gun was found on Lacey or in Lacey's vehicle. Owens further testified that a peace bond is meant to keep people away from each other, but that night, Dille purposely came to where he knew Lacey would be. On cross-examination, Owens agreed that a peace bond is different from a restraining order.

¶13.    The State's next witness was Crime Scene Investigator Mamie Barrett, who testified about the crime scene photos she took the night of the shooting. Two photos showed the

---

[6] Peremptory strikes alleged to be racially discriminatory are analyzed under *Batson v. Kentucky*, 476 U.S. 79 (1986).

bloodied body of the deceased still positioned in the opening of the back-seat passenger door. The court overruled Dille's objections to the photos, and they were admitted. Barrett also testified about the photos she took later while she was processing the car, as well as the bullet fragments and shell casings she collected at the scene. She explained how the trajectory of the bullets was reflected in the photos.

¶14. Dr. Mark LeVaughn, the Chief Medical Examiner for the State of Mississippi, testified next. He had been a forensic pathologist for thirty-two years and was accepted, without objection, as an expert witness. Over Dille's objection, the court admitted Lacey's autopsy photos, which showed the eight gunshot wounds to Lacey's body. Two grazed the surface of the skin; six entered and exited through the body. LeVaughn also testified about the trajectory of the bullets that caused these wounds. Despite Dille's objection, the court allowed LeVaughn to opine that several of these wounds were not survivable given the damage to vital organs that the bullets caused. On cross-examination, LeVaughn admitted that he did not perform the autopsy; another medical examiner, Dr. Lisa Funte, had done it and prepared the report. Her report reflects that the manner of death was "homicide," which LeVaughn defined as "when someone dies as a result of the actions of another person." LeVaughn agreed that the people in the medical examiner's office would not know whether the actions of the shooter were taken in self-defense; the death would still be classified as a "homicide." On re-direct examination, LeVaughn explained that he also signed Lacey's autopsy report pursuant to their office's internal quality-assurance protocols. He had signed it after reviewing the entire file, including photographs, toxicology, et cetera.

8

¶15.    JPD Officer Lincoln Lampley testified next. He was on duty the night of the shooting and had just pulled up to the intersection of Bailey Avenue and Woodrow Wilson Avenue when he heard gunshots. He turned and observed Dille in the parking lot of the Exxon station firing into the back of a pink sedan. Lampley pulled into the parking lot, approached Dille, and ordered him to throw the gun down. Dille immediately complied and lay on the ground while Lampley placed restraints on him. Lampley then went to Lacey to assess his injuries. Lampley said he pulled Lacey from the vehicle and tried to stop the bleeding, but he could not determine exactly where Lacey was hit. Lampley's hands became covered in blood. When he determined his attempts to assist Lacey were futile, Lampley moved to the passenger side of the vehicle where he tried to remove the child from the car-seat restraint. He was unable to unbuckle the belt because of the large amount of blood on his hands, so Lampley cut the seatbelt with his pocket knife. He examined the child but she was not hit; she was just shaking. He held her until the next officer arrived on the scene. Lampley then returned to Dille who, without any prompting, said that he had a peace bond against Lacey and that "it was self-defense." Dille told Lampley that he feared for his life and that he had had previous incidents with Lacey. Another officer put Dille into a patrol car and transported him downtown.

¶16.    Lampley said he remained on the scene and was able to review the store surveillance video. He said that he retrieved the gun that Dille had used, which the State entered into evidence. The gun had additional live rounds in it that Lampley removed. Lampley also testified he understood that a peace bond requires that when subject people are in the vicinity

9

of one another, they are ordered to keep the peace. Further, Lampley said, a peace bond states that the individuals involved are not supposed to have contact with each other at all. Basically, he explained, "you're supposed to stay away from each other."

¶17. After the jury was excused, the court and the parties questioned Lampley concerning the administrative leave that the Jackson Police Department had placed him on began in January 2019. The issue had not been resolved, and Lampley did not know what the issue was. He said he was placed on leave "due to an allegation," but the circuit court would not allow questioning on what that allegation was because of the ongoing investigation. After Lampley's testimony, the State rested.

¶18. Dille moved for a directed verdict, which the circuit court denied. Dille chose not to testify, and in his defense, he called his father, Lincoln Dille Sr., and Rosemary Johnson as witnesses. Dille's father testified that his son was "raised right"; he was an honor roll student at Provine High School; he was never in fights; and he loved Johnson. His son, Dille, had no criminal record and until this incident, he had never been in jail. Dille worked and contributed to his and Johnson's household and had a loving relationship with Johnson and her daughter. Dille, his father said, never did any harm to the child.

¶19. Dille Sr. also told the jury about his son's fear of Lacey. Dille Sr. had personally witnessed Lacey trying to attack his son in December 2013. At that time, Dille Sr. went to Johnson's apartment when he had learned of a confrontation between Lacey and Dille. When his father arrived, Dille got into the car, and Dille Sr. learned that Lacey had locked his son out of the apartment. They waited until Lacey brought the child out and put her in the car

10

seat in Lacey's car. When Dille got out to return to the apartment, Lacey confronted him, with threatening gestures. Dille Sr. heard Lacey say that Dille was disrespecting him by staying in the apartment with Johnson and his child. Lacey told Dille that he better move out or "you gonna be sorry. I'll F-you up, you know." Lacey made a gesture of reaching behind his back as if he had a gun. Only when Dille Sr. called out from his vehicle did Lacey back down. His father said Dille was afraid of Lacey and that his son had called 911 several times in the past. The police would come, but Lacey would not stop harassing them. Dille finally secured a peace bond against Lacey, which Dille Sr. identified. A certified copy was admitted into evidence. Dille Sr. also testified that just days before this incident, Lacey and Lacey's cousin had pulled a gun on Dille at the apartments, and Dille ran into the house. After that, Dille purchased a weapon for his protection.

¶20. Rosemary Johnson testified that she knew Dille from high school, but they only started dating in 2013. She said that Dille was a nice, hard-working person who stayed out of trouble. He was a peaceful person and never started any altercations. He was also a good provider, and he had a good relationship with her two-year-old daughter. Dille bought their groceries, bought toys, and accompanied her to the doctor with the child.

¶21. Johnson said she had a good relationship with Lacey, who regularly contributed to his daughter's care. But Lacey did not like the fact that she had moved on from their relationship. Lacey would get upset and jealous. He "would get up in [Dille's] face" and hers too. She confirmed that Lacey once locked Dille out of Johnson's apartment and that Dille's father came to the apartment. Another time, at a Dollar General store, Lacey

11

confronted Johnson and told her that he did not want anyone around his baby. Lacey followed her around the store. At the time, Dille was talking to the store manager and filling out an application. Johnson also testified to a confrontation between Lacey and Dille on Christmas Day of 2013. Lacey came to the apartment to bring gifts for the child. Lacey had words with Dille and tried to provoke a fight. But Dille merely walked away. Another incident occurred about two weeks before the February 18, 2014 shooting: Lacey and his cousin came to the apartment and threatened Dille with a gun. Dille told her to call the police. After this incident, Dille obtained the peace bond. She confirmed that Dille purchased a gun because he was afraid of Lacey.

¶22. On the day of the shooting, Johnson said she had asked Lacey to exchange custody of the child at her aunt's house as he had done in the past. Lacey refused and demanded that she come to the Exxon gas station. Johnson tried to get her uncle to go with her because she and Lacey had been arguing about Johnson's claiming their daughter on her tax return. But her uncle refused to go. Johnson called the police so they could be present as a preventative measure. The police told her that they were tired of coming out to their apartment and that if they had to come out again, everybody was going to get arrested. So Dille went with her.

¶23. Johnson continued that when Lacey arrived, Dille got out and walked toward the store. Lacey did not immediately get the child out of the car, but he began to confront Dille. She said Lacey threatened Dille, but she could not hear what they were saying because Lacey had his sound system playing. Johnson said Lacey commonly carried his gun with him everywhere he went. After Lacey was shot, Johnson ran to him, and she heard him say to

12

Dille, "Why did you shoot me?"

¶24. The court would not allow Johnson to testify about Lacey's assault on her prior boyfriend Arcola, and the defense made a proffer. During the proffer, Johnson testified that she was dating Arcola after Lacey but before Dille. Lacey and a friend of his jumped on Arcola because Arcola was in the car with her and her baby. Lacey and his friends had a weapon, but they did not use it. Johnson told Dille about the incident. The jury did not hear this testimony.

¶25. After a recess, the court learned that Johnson had been approached by Lacey's sister, Kedorie Lacey, during the break.[7] Outside the presence of the jury, the court and the parties asked Johnson about this encounter. Johnson said that she had been approached in the hallway by Kedorie who told Johnson that she did not like how Johnson was testifying. Johnson said she felt intimidated by Kedorie but that her testimony had been truthful. Dille moved for a mistrial, which the court denied.

¶26. After Johnson's testimony, Dille rested. The State presented no rebuttal. Dille renewed his motion for a directed verdict, which the court denied. After conferring with counsel about the jury instructions, the court charged the jury. The jury received instructions on first-degree (deliberate design) murder, second-degree (depraved heart) murder, heat-of-passion manslaughter, shooting into an occupied vehicle, and self-defense. Thereafter, the parties made closing arguments.

---

[7] Johnson testified that she and her daughter still have a relationship with Lacey's family. But this particular encounter was not a friendly one.

¶27.   During its deliberations, the jury sent a question to the court.  The jury wanted to know what would be considered the "fatal act" as mentioned in the instruction on first-degree murder.  They wanted to know if the fatal act would be the overall incident, or if the fatal act would be when the victim died.  The circuit court did not disclose this note to the State nor to Dille and the judge wrote back to the jury to refer to the jury instructions and continue their deliberations.  The jury's note and the court's response were not made a part of the record.

¶28.   The jury found Dille guilty of first-degree murder but not guilty on the charge of shooting into a vehicle.  Thereafter, the circuit court sentenced Dille to life imprisonment in the custody of the Mississippi Department of Corrections.

¶29.   On April 17, 2019, Dille filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial.[8]  In the motion, Dille argued that the State had failed to prove all the elements of murder and that circuit court had erred in several ways, including, but not limited to, denying Dille's *Batson* challenge, denying Dille's motion for a directed verdict, denying Dille's motion to prevent the surrogate medical examiner from testifying, limiting the proffer of Officer Lampley, allowing Johnson to testify to what she heard Lacey say, preventing the defense from questioning Johnson about a physical confrontation between Lacey and Johnson's prior boyfriend Arcola, failing to grant a mistrial when Johnson was confronted by the decedent's sister, and failing to tell the parties about

_____

[8] Thereafter on April 29, 2019, Dille filed an amended motion, which was nearly identical to the initial one.

14

the jury's question. Dille attached an affidavit from Juror #4 concerning the note from the jury and the judge's response.[9]

¶30.    The circuit judge heard arguments on Dille's post-trial motion on May 1, 2019, and said the court would issue an order within ten days. When no order was rendered within that time, Dille appealed on May 17, 2019.[10]

¶31.    On appeal, the Office of State Public Defender represents Dille and raises five issues in its brief: (1) whether the circuit court erred in admitting Lacey's "dying declaration"; (2) whether the circuit court erred in limiting Dille's proffer of testimony from Officer Lampley; (3) whether the circuit court erred in denying Dille's motion for a mistrial; (4) whether the circuit court erred in its handling of the jury question; and (5) whether the circuit court erred in excluding testimony of Lacey's assault on Johnson's former boyfriend.

¶32.    Dille filed a pro se brief and raised additional issues: (6) whether the circuit court erroneously denied Dille's *Batson* challenge; (7) whether the circuit court erred in failing to

---

[9] In addition to identifying herself in paragraphs 1–4, her affidavit said:

¶5. During jury deliberations, my fellow jurors and I had a question about one of the jury instructions.
¶6. Specifically, our question was regarding what would be considered the fatal act as mentioned in the jury instruction on 1st degree murder.
¶7. We wanted to know would the fatal act be the overall incident or was the fatal act when the victim died.
¶8. We sent this question in a written note to the judge.
¶9. The judge responded in a written note to us by telling us to refer to the jury instructions and continue our deliberations.

[10] There was no order denying Dille's motion, but Mississippi Rule of Criminal Procedure 25.3 provides that post-trial motions pending for over thirty days are deemed denied. *Foster v. State*, 281 So. 3d 229, 230 n.1 (Miss. Ct. App. 2019).

grant Dille's motion to strike the surrogate medical examiner's testimony; (8) whether Dille was denied his constitutional right to a speedy trial; (9) whether the circuit court erroneously suppressed Lacey's toxicology report; (10) whether statements by the State in closing argument constituted prosecutorial misconduct; (11) whether the State failed to prove all the elements of first-degree murder; (12) whether there was overwhelming evidence of justiciable homicide; (13) whether Dille received ineffective assistance of counsel when his attorney failed to call a witness.

**Discussion of Issues Raised by Counsel**

I.      **Whether the circuit court erred in admitting Lacey's "dying declaration."**

¶33.    The circuit court granted the State's motion in limine and allowed Johnson to testify that after Lacey was shot, Lacey asked Dille, "Why did you shoot me?" The circuit court did not make any specific findings as to the reasons it allowed such testimony, although the parties presented arguments and law to the court during the hearing on the motion. On appeal, Dille contends that this statement constituted inadmissible hearsay and was irrelevant. The State argues that the statement was admissible because it falls into several exceptions to the hearsay rule to show Lacey's state of mind.

¶34.    "The trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence, and this Court will not reverse the trial court's ruling unless the judge abuses this discretion so as to be prejudicial to the accused." *Carter v. State*, 288 So. 3d 397, 401 (¶15) (Miss. Ct. App. 2019). In this instance, the circuit court did not abuse its discretion as discussed below.

16

*A.      Hearsay*

¶35.    Out-of-court statements, sought to be admitted for the truth of a matter, ordinarily constitute inadmissible hearsay under Rule 801of the Mississippi Rules of Evidence. *Davis v. State*, 158 So. 3d 1190, 1196 (¶27) (Miss. Ct. App. 2015).  "However, a trial court may admit a hearsay statement if those statements meet the hearsay exceptions promulgated by law.  Dying declarations and excited utterances both allow for the admittance of hearsay evidence as exceptions to the general bar on hearsay evidence." *Id.*  Specifically, Rule 804(b)(2) provides an exception to the exclusion of certain statements of persons unavailable as witnesses, including  "[i]n a prosecution for homicide . . . , a statement that the declarant, while believing the declarant's death to be imminent, made about its cause or circumstances." MRE 804(b)(2).  As we stated in *Nichols v. State*, 965 So. 2d 770, 771 (¶4) (Miss. Ct. App. 2007), "a dying declaration is made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death."

¶36.    In *Watts v. State*, 492 So. 2d 1281, 1287 (Miss.1986), the Mississippi Supreme Court provided a three-prong test for the admission of a dying declaration: (1) "[t]he wounded person is in extremis and dies after making the statement"; (2) "[t]he person realizes that he is mortally wounded," and (3) '[h]e has no hope of recovery."  Citing *Watts*, we stated in *Trotter v. State*, 9 So. 3d 402 (Miss. Ct. App. 2008), that the "'knowledge of impending death may be inferred from the nature and extent of the wound inflicted upon the victim,' without any expressed declaration of the victim to show 'he was sensible of impending

17

death.'" *Id*. at 407 (¶11) (quoting *Watts*, 492 So. 2d at 1287-88). In *Trotter*, we found that the investigating police officer's testimony concerning the extent of the victim's observable wounds and drifting in and out of consciousness, along with the victim's subsequent death, was sufficient to meet the criteria for the victim's statements to be admissible as a dying declaration. *Id.*

¶37. Even if the circuit court did not articulate the basis for its admission of Lacey's statement, there was sufficient evidence presented in the record to establish it as an admissible dying declaration. Lacey undisputedly uttered the statement, "Why did you shoot me," after he had been shot eight times. Within seconds, Lampley was on the scene and found Lacey bleeding so profusely from his wounds that he was "gurgling blood" and unable to speak further. Lampley tried to stop the bleeding, but Lacey's "injuries were too great and he was losing too much blood too fast." Lampley "almost immediately" realized he was not going to be able to help Lacey and went to tend to the child in the car seat. Thus, the proof showed that Lacey was "in extremis" and died shortly after making the statement. Moreover, from the severity of his wounds after being shot eight times, we can infer that Lacey was aware of his impending death. *See id*.; *Ellis v. State*, 558 So. 2d 826, 830 (Miss. 1990) (declarant's belief that his death was imminent may be shown circumstantially by the apparent fatal quality of his wound). Finally, Lacey's statement clearly relates to the shooting and the circumstances immediately attending it. It was not an opinion nor an expression of malice or ill will, which would have been prohibited. *See Watts*, 492 So. 2d at 1288. In summary, the evidence presented was sufficient to admit Lacey's statement as

18

a dying declaration and we find no abuse of discretion.

> ### B. Relevance

¶38. Dille further contends that Lacey's statement was irrelevant, arguing that Dille's, not Lacey's, state of mind was at issue, (i.e., whether Dille felt threatened by Lacey and acted in self-defense). Indeed, in *Walker v. State*, 759 So. 2d 422, 426-27 (¶15) (Miss. Ct. App. 1999), we held that prior statements of a victim that the shooter had threatened him during the month before the shooting were irrelevant and inadmissible. But we also pointed out that they were irrelevant because it was unclear what Walker's defense was. *Id.* We said that the victim's statement would be hearsay "in the absence of a clearly asserted claim of self defense or accidental shooting . . . ." *Id.* "[T]here are several exceptions to the general rule that a homicide victim's hearsay statements are inadmissible. First, a victim's state of mind is at issue when it goes to a material element of the crime. Second, the victim's state of mind may become relevant to an issue in the case where the defendant claims: (1) self-defense; (2) that the victim committed suicide; or (3) that the death was accidental." Charles W. Francis III, *Submitting to Legal Authorities: The Difference Between Interpretation of Federal Rule of Evidence 803(3) and Application of Mississippi Rule of Evidence 803(3)*, 81 Miss. L.J. 1597, 1603 n.32 (2012) (quoting Michael H. Graham, *Handbook of Federal Evidence* § 803:3, at 138 (6th ed. 2006)).

¶39. Here Dille claimed self-defense from the moment he shot Lacey to his closing argument at trial. By claiming self-defense, Dille asserted that Lacey was the aggressor in the encounter, and thus, Dille put Lacey's state of mind at issue. *Walker*, 759 So. 2d at 426-

27 (¶15). The video contained no audio, so the jury could not hear what Lacey and Dille said to each other. But after the shooting, when Johnson exited her car and ran up to Lacey, she heard his last words. In this case Lacey's dying declaration was admissible because Dille put the intent of the victim at issue when Dille claimed self-defense. Lacey's words, which gave the jury some information as to Lacey's intent, were relevant.

¶40.    In summary, we find no error in the admission of Lacey's statement prior to his death because it was a dying declaration. Additionally, the statement was relevant because Lacey's state of mind became an issue when Dille claimed that he shot Lacey in self-defense.

**II.    Whether the circuit court erred in limiting Dille's proffer of testimony from Officer Lampley.**

¶41.    The shooting in this case occurred in 2014. After a mistrial in 2018, Dille was retried in 2019. In January 2019, JPD placed Officer Lampley on administrative leave. The State filed a motion in limine to preclude the defense from asking Lampley about the administrative leave during Lampley's cross-examination. Before trial, the circuit court heard arguments on the State's motion and ruled:

> [S]ince this matter has been to trial before and the court has the benefit of that, the court would find that there is no relevance to any matters of this officer's administrative leave that the court could imagine. So the court is going to rule that any testimony regarding an administrative matter with the officer will be excluded.

¶42.    At trial, outside the presence of the jury, the circuit court allowed the defense to make a proffer. The circuit judge began by asking Lampley whether the administrative investigation that led to Lampley's leave was still on-going or had a determination been made. Lampley said no determination had been made, and he did not even know if an

20

investigation had been formally opened. He said he had not been officially advised about why he was placed on leave. The defense questioned Lampley, who reiterated that he did not know why he was placed on administrative leave:

> Q. (BY THE DEFENSE): And you claim you have no idea why you're on administrative leave?
>
> STATE: Objection, Your Honor.
>
> THE COURT: He can answer it.
>
> STATE: Objection.
>
> A. Yes, ma'am, I do.
>
> THE COURT: He can answer it.
>
> A. Yes, ma'am, I do.
>
> (BY THE DEFENSE): Oh, you do?
>
> A. Uh-huh.

The circuit court questioned Lampley further:

> THE COURT: And the question was do you know why you were placed on administrative leave?
>
> A. Due to an allegation.

¶43. After Dille complained that he was entitled to know the nature of the allegation, the circuit judge pressed Dille's counsel for authority that a witness may be impeached by mere allegations. The circuit judge also asked Dille's counsel to identify what portion of Lampley's testimony would be affected by knowledge of this allegation, saying:

> THE COURT: Well, this trial is not about him (Lampley). I know you want it to be that way because I keep asking you what portion of his testimony that

21

he gave could possibly be affected by an administrative appeal?  Was there something that he gave that -- he drove up, he saw the gun.  What portion of his testimony are you saying is maybe not reliable?

Moreover, Lampley's testimony of the events was supported by the surveillance video.

Ultimately, the circuit court ruled:

[I]t (the allegation) would not be allowed to be shared with anyone in the courtroom because of the ongoing investigation.  And the reason that the court questioned the witness regarding the determination of the matter against him was that if it had been a determination, then possibly that would have at least been discoverable.  But since it's an ongoing investigation, the court finds that it is not discoverable and it is not admissible.

¶44.    Dille contends on appeal that the circuit court's failure to allow him to question Lampley further to determine the nature of the allegation that caused his administrative leave denied Dille of his right to make a full proffer and of his Sixth Amendment right to confrontation.

¶45.    The Mississippi Supreme Court has underscored the need for a full proffer on the record so that the appellate court can properly evaluate the propriety of a trial court's exclusion of evidence. *Jones v. State*, 306 So. 2d 57, 58 (Miss. 1975).  "The right to preserve testimony through an appropriate offer of proof is essential to insure justice and fairness. This is especially true in criminal trials where the broadest latitude is permitted on cross-examination." *Id*. at 59.

¶46.    Refusing to allow a defendant to make a proffer at all is reversible error.  In *Kidd v. State*, 258 So. 2d 423, 428 (Miss. 1972), after the trial court had excused the jury, it still refused to allow the defendant to ask the chief of police about conversations he had with the now-deceased father of the defendant who had witnessed the shooting/stabbing event.  The

22

supreme court reversed and remanded for a new trial. *Id*. at 428-29. Similarly, in *Jones*, 306 So. 2d at 58, the trial court refused to allow a defendant to make a proffer of testimony of two undercover agents' recollections of prior drug purchases. In response to the defendant's request, the trial judge said the proffer was not going to be allowed "because I am not going to clutter up the record with irrelevant testimony." *Id.* The supreme court reversed and remanded for a new trial. *Id*. at 58-59.

¶47. But *Kidd* and *Jones* are not applicable in Dille's case because here the circuit court did allow the defense to make its proffer of Lampley's proposed testimony. Dille admits this but complains that the circuit court did not allow him to complete his proffer and ask Lampley about the "allegation" that led to his administrative leave. This interruption, Dille argues, effectively prevented him from fully cross-examining Lampley.

¶48. Mississippi Rule of Evidence 608 allows questioning of a witness to establish his character for untruthfulness in limited circumstances. Specifically, Rule 608(b) provides:

> (b) Specific Instances of Conduct. Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > (1) the witness; or
> > (2) another witness whose character the witness being cross-examined has testified about.

In this case, the circuit court's rationale for ending the proffer was that Lampley's administrative matter was on-going and that mere allegations could not be used for impeachment. Moreover, the circuit court felt that even if the "allegation" related to some

23

act of dishonesty or untruthfulness, Lampley's contribution to the evidence in Dille's trial was simply facts of events that were verified by the surveillance video. We agree based on our holdings in *Ellis v. State*, 856 So. 2d 561 (Miss. Ct. App. 2003), and *Johnson v. State*, 198 So. 3d 427 (Miss. Ct. App. 2016).

¶49.   In *Ellis*, an investigating detective in a robbery/shooting case, who had interviewed Ellis and others, had himself been arrested on a bribery charge and resigned his position. *Ellis*, 856 So. 2d at 564 (¶6). The trial court granted the State's motion in limine to preclude any questioning about the bribery allegations. *Id.* We affirmed the trial court's decision, noting that "the proffered conduct must be such as to reflect upon the witness's character for truthfulness." *Id.* at 565 (¶9). We reviewed the procedure to be used, including a hearing, and the court's determination as to whether the conduct shown reflects on the witness's character for truthfulness, followed by the court's weighing the probative value against the danger of unfair prejudice should the jury be presented with the testimony. *Id.* We recognized the defendant's fundamental right to cross-examine a witness,

> [h]owever, the rule does not allow cross-examination on any matter affecting the credibility of witnesses without restraint. The privilege only extends to any matter that is relevant. Accordingly, the scope of cross-examination though ordinarily broad, is within the sound discretion of the trial court and the trial court possesses inherent power to limit cross-examination to relevant matters.

*Id*. at 565-66 (¶10) (citations omitted). We held that the investigating officer's alleged prior bad acts were too far removed to be relevant,  and the questioning was properly excluded. *Id*. at 566 (¶11). We also noted the distinct difference between unsubstantiated bad acts and prior bad acts. *Id.*

24

¶50. In *Johnson,* a case factually similar to *Ellis*, one of the interrogating police officers of a 2011 robbery left the JPD in September 2012 when he resigned rather accepting reassignment due to allegations of taking bribes. *Johnson*, 198 So. 3d at 428 (¶5). The State filed a motion in limine to preclude the defendant from cross-examining the officer about his resignation from JPD. *Id.* The trial court granted the motion, concluding that the possible bribery allegations were not related to the officer's testimony concerning the voluntariness of the defendant's confession. *Id*. at 429 (¶5). After the defendant's conviction, he raised the court's ruling as his single issue on appeal. *Id*. at (¶8). We held that the trial court did not abuse its discretion by precluding cross-examination on the bribery allegations, citing *Ellis*. *Id*. at 430 (¶10). Noting the difference between substantiated and unsubstantiated bad acts, we pointed out that the officer in *Johnson*, unlike the investigating officer in *Ellis*, had not even been arrested or charged with accepting a bribe. *Id*. at 430 (¶11). We held that the trial court did not abuse its discretion in excluding such unsubstantiated allegations. *Id.* We also agreed that investigation of the officer was irrelevant to the issues in the defendant's trial. *Id*. at (¶12). The officer's testimony that the defendant was not coerced or threatened in his interview was substantiated by an audiotape and other exhibits. *Id.* We concluded that there was "no logical reason that the jury would have given less weight to [the defendant's] own recorded and handwritten confessions had they been made aware that someone apparently accused [the officer] of bribery in some unrelated case." *Id*. at 430-31 (¶12).

¶51. In this case, we hold that the circuit court did not err in excluding questioning of Lampley concerning the "allegation" that may have caused his administrative leave.

25

Although Lampley said the administrative action was taken "due to an allegation," there was no testimony that he knew what that allegation was. To the contrary, Lampley testified that he did not know the reason why he was placed on administrative leave. The action was taken by the department, and Lampley said he had not since spoken to his superiors. Moreover, as in *Ellis*, the most any additional proffer could have established would have been an unsubstantiated allegation.

¶52. Additionally, this administrative leave action was taken in January 2019, long after Lampley's involvement in the Dille case in 2014. Lampley's testimony was merely factual, concerning the events of that night as he arrived on the scene. Most of the testimony was substantiated by the surveillance tape. Lampley had little if any interaction with Dille and testified only to statements that Dille made at the scene claiming that he had shot Lacey in self-defense. As we found in *Johnson*, there was no logical reason why the jury would have given less weight to Lampley's testimony about that night had they been aware that someone had accused Lampley of some action in an unrelated matter six years later. Accordingly, we hold that the circuit court did not abuse its discretion in preluding Dille from questioning Lampley concerning his administrative leave.

### III. Whether the circuit court erred in denying Dille's motion for a mistrial.

¶53. After Johnson had testified on direct and cross-examination, but before she was excused, the court took a break. During that break, one of Lacey's sisters accosted Johnson and told Johnson that she did not like how Johnson was testifying. Johnson reported this to the bailiff, who told the judge when court reconvened. The judge cleared the courtroom and

26

questioned Johnson as to whether she felt intimidated by the sister. Johnson said she had but that she had testified truthfully and would change nothing in her testimony. Thereafter Dille moved for a mistrial, which the circuit court denied. Dille now raises the denial of his motion for a mistrial as an issue on appeal.

¶54. Whether to declare a mistrial is within the discretion of the trial court, and on appeal, our review is for abuse of that discretion. *Dora v. State*, 986 So. 2d 917, 921 (¶8) (Miss. 2008); *Edwards v. State*, 305 So. 3d 1186, 1190 (¶10) (Miss. Ct. App. 2020). "A trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Young v. State*, 281 So. 3d 179, 186 (¶29) (Miss. Ct. App. 2019). The trial court is in the best position to make such a determination. *Tate v. State*, 912 So. 2d 919, 932 (¶41) (Miss. 2005).

¶55. Although Johnson said she felt intimidated, our review of the record here does not show that Dille's case was substantially and irreparably prejudiced by Johnson's encounter with Lacey's sister. The circuit court thoroughly questioned Johnson to determine the effect of the encounter on her and her testimony.

> THE COURT: Did that intimidation, did it make you fearful of giving certain testimony?
>
> THE WITNESS: No, it just made me uncomfortable like how she was approaching me. **Not intimidated** but, you know, getting in my face like she was upset.
>
> . . . .
>
> THE COURT: Well, the court need[s] to know whether or not this witness is in fact afraid to give truthful testimony because of what someone else has said to you?

27

THE WITNESS:	No, no, no. **My testimony remains the same**. She just made me feel -- as a whole, feel uncomfortable like approaching me, you know, like I'm mad at you.

. . . .

THE COURT:	All right. Before I make a ruling, Ms. Johnson, let me make sure. I think I asked you this question earlier. **After the sister approached you, do you feel the need to change any testimony that you've given or will give in the future?**

THE WITNESS:	**No, sir**. It's just like she wanted to fight me. She already wants to fight me. So me being here today and they already don't like me.

THE COURT:	And you appeared here today because you are subpoenaed to be here?

THE WITNESS:	Yes.

THE COURT:	**And you've given truthful testimony?**

THE WITNESS:	**Yes.**

THE COURT:	**And any further testimony today will be truthful?**

THE WITNESS:	**Yes.**

(Emphasis added). Johnson had already testified, been cross-examined, and was about to be questioned on re-direct when the incident occurred. Clearly her testimony prior to the encounter could not have been influenced by it. Thereafter, Johnson's final questioning by the defense was brief, during which Johnson testified about having to call the police earlier on the day of the shooting "as a protective measure." Johnson also said Dille was a peaceful person. Johnson testified that she was not intimated and clearly did not to shrink from her oath to provide truthful testimony, which was favorable to Dille. Finding no irreparable

28

prejudice to Dille, we hold that the circuit court did not abuse its discretion in denying Dille's motion for a new trial based on Johnson's encounter with Lacey's sister.

### IV. Whether the circuit court erred in its handling of a jury question.

¶56. During its deliberations, the jury sent out a question. Juror #4 said in her affidavit:

> Specifically, our question was regarding what would be considered the fatal act as mentioned in the jury instruction on 1st degree murder. We wanted to know would the fatal act be the overall incident or was the fatal act when the victim died. We sent this question in a written note to the judge. The judge responded in a written note to us by telling us to refer to the jury instructions and continue our deliberations.

The judge did not share the question with the State or the defense before responding. After the jury reached its verdict and the trial was over, Dille learned about the jury question and the court's response. On appeal, Dille claims that the judge's unilateral actions warrants reversal and a new trial.

¶57. Rule 23.3(a) of the Mississippi Rules of Criminal Procedure deals with providing jurors with additional instructions after they have begun their deliberations:

> (a) Additional Instructions. If the jury, after they retire for deliberation, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court, *after affording the parties an opportunity to state their objections or assent*, may grant additional written instructions in response to the jury's request.

(Emphasis added). "A trial court has authority to give supplemental instructions to a jury[,] and the decision to do so is reviewed under an abuse-of-discretion standard." *Hughes v. State*, 983 So. 2d 270, 280 (¶41) (Miss. 2008). When presented with a question from the jury, the trial court must first determine whether any further instruction is needed for clarity or to cover an omission. *Id.* But the court must be careful in its response not to single out

29

a particular jury instruction or principle. *Id*. at 281 (¶43).

> Unless the trial court based its decision on an erroneous view of the law, this Court is not authorized to reverse for an abuse of discretion absent a finding the trial court's decision was "arbitrary and clearly erroneous." We will not reverse simply because we think the trial court was "right or wrong" in its response.

*Thompson v. State*, 230 So. 3d 1044, 1054 (¶32) (Miss. Ct. App. 2017).

¶58. In the case at hand, during arguments on Dille's JNOV motion, the circuit court acknowledged that the jury had sent out a question:

> THE COURT: For the record, the jury did send a question out asking for information on deliberate design. And the court did not give further instructions but told them to follow the court's instructions.

The circuit court failed to apprise the State and the defense of the question as required by Rule 23(a). But as the State points out, the circuit court gave no substantive supplemental instruction, as the circuit court did in *Hartzog v. State*, 240 So. 3d 462, 467 (¶16) (Miss. Ct. App. 2017).[11] Here, the circuit court merely told the jury to follow the instructions it had already been given. Clearly, the circuit court's response was not an erroneous statement of law or arbitrary, and we find no abuse of his discretion in the response. Any error was harmless.

¶59. Dille additionally argues that his constitutional right to be present during all stages of his trial was violated when he was not apprised of the jury's question. We agree that "[b]oth

---

[11] In *Hartzog*, 240 So. 3d at 466 (¶16), the jury sent three questions during its deliberations. In response to one, the circuit court sent the jury an additional instruction concerning the definition of constructive possession of a firearm. *Id.* But it did so only after consulting with the parties. *Id.*

our federal and state constitutions guarantee an accused's right to be present at every stage of his or her trial." *Hampton v. State*, 309 So. 3d 1055, 1060 (¶25) (Miss. 2021) (citing U.S. Const. Amend. VI; Miss. Const. art. 3, § 26). Our appellate courts have not yet determined whether a question from the jury during jury deliberations requires the defendant's presence. But other jurisdictions have.

¶60. New York courts have ruled that the defendant's presence at the review of jury questions and the response is mandatory and that acting without the defendant constitutes reversible error. *People v. Miller*, 539 N.Y.S.2d 782, 783 (N.Y. App. Div.1989) ("The defendant has an absolute right to be present with counsel, at all proceedings concerning the court's charge, admonishments, instructions to the jury and responses to jury questions during deliberations" (quoting *People v. Mehmedi*, 500 N.Y.S.2d 304, 307 (1986), *aff'd*, 505 N.E.2d 610 (N.Y. App. Div. 1987). In *People v. Childs*, 636 N.E.2d 534 (Ill. 1994), the Illinois Supreme Court held that reversible error depends on whether the trial court replies to a jury question involving substantive law outside the presence of the defendant, explaining:

> The jury posed an explicit question regarding what the State concedes is an "intricate" and "difficult" point of law, and which other cases suggest is not an uncommon source of juror confusion. Although the trial court did not fully understand the question, it made no effort to seek clarification of it. The court deprived defendant of his rights to be informed of the question and to allow his counsel to participate for defendant's protection in the process of determining what would be an appropriate response to it.

*Id*. at 542.

¶61. The Minnesota Supreme Court has held that a defendant has a Sixth Amendment right

31

to be present because "[r]esponding to a deliberating jury's question is a stage of trial." *Cooper v. State*, 745 N.W.2d 188, 191 (Minn. 2008) (quoting *State v. Sessions*, 621 N.W.2d 751, 755 (Minn. 2001)).  However, the *Cooper* court went on to find that the trial court's error in not having the defendant present when it responded to a jury's request to review a state witness's testimony was harmless error:

> Furthermore, we have reviewed the merits of Cooper's claim and conclude that the trial judge's error in communicating with the jury outside the presence of Cooper and his counsel was harmless error.  Here, the judge's response to the jury's question gave "no new information and did not favor either the prosecution or the defense."  While the better practice is for the district court to follow the mandates of Minn. R.Crim. P. 26.03 to ensure that the criminal defendant's Sixth Amendment right to be present at all stages of the trial is protected, the judge's actions in this case were harmless error.

*Id*. at 192 (citations omitted).  The Minnesota Court of Appeals recently cited *Cooper* in *State v. Cookson*, No. A19-0629, 2020 WL 3410482, at *3 (Minn. Ct. App. June 22, 2020), as supportive precedent to find an error was harmless.

¶62.     In this case, we agree that Dille had a procedural and constitutional right to be present when the circuit court reviewed the jury question.  The circuit court erroneously violated Dille's right to be present when the court issued its response without notification to the parties.  But because the circuit court granted no substantive supplemental instruction to the jury, the circuit court's error  was harmless.[12]  Accordingly, we find no reversible error by the circuit court in its handling of the jury question in this case.  We note, however, that in

---

[12] Because the question and response are not in the record, we cannot determine whether a substantive supplemental instruction could have been crafted.  We only have the juror's affidavit, which contains her recollection of the jury question.

the future, trial courts should follow Rule 23.3, call all parties when the jury sends a question, and fashion any response with their input. Moreover, the jury question and the court's response should be included in the record.

### V. Whether the circuit court erred in excluding testimony of Lacey's assault on Johnson's former boyfriend.

¶63. Dille contends that he was denied a fair trial when the circuit court excluded testimony from Johnson concerning Lacey's threats and assault on her former boyfriend Arcola. The circuit court found that the statements were hearsay, too far removed in time from the shooting, and more prejudicial than probative. The State argues that Dille did not witness an assault on the prior boyfriend and that Dille was still able to present evidence of Lacey's pugilistic character through other means.

¶64. Testimony of the Arcola incident would be classified as evidence of Lacey's character. Evidence of a person's character is usually not admissible to show that on a particular occasion, he acted in conformity with his character. MRE 404(a)(1),(b)(1). But in criminal cases, the defendant may be allowed in certain circumstances to present evidence of his own or the victim's character. MRE 404(a)(2)(A)-(B); *Giles v. State*, 282 So. 3d 519, 524 (¶12) (Miss. Ct. App. 2019). The decision of admissibility of evidence is within the discretion of the trial court, and we review for any abuse of that discretion. *Bell v. State*, 303 So. 3d 22, 25 (¶9) (Miss. Ct. App. 2020).

¶65. In cases of claimed self-defense where the jury must decide who was the aggressor, character evidence of the victim has been allowed. Even before the adoption of the Mississippi Rules of Evidence, the Mississippi Supreme Court stated:

33

> In order to admit evidence of the violent character of deceased as bearing on the apprehension of danger by the accused, it must appear to have been known to him; consequently evidence of his knowledge of such character is admissible. As bearing on the question of who was the aggressor, however, evidence of the character of the deceased is admissible although the accused had no knowledge thereof.

*Freeman v. State*, 204 So. 2d 842, 844 (Miss. 1967) (citing 40 C.J.S. *Homicide* § 272 at 1223 (1944).

¶66. But "before testimony of bad character of a deceased is admissible under one of the exceptions to the general rule, the evidence must show that the issue of self-defense must at least be in doubt." *Shinall v. State*, 199 So. 2d 251, 257 (Miss. 1967), *overruled on other grounds by Flowers v. State*, 473 So. 2d 164, 165-66 (Miss. 1985). For example, in *Gates v. State*, 936 So. 2d 335, 339 (¶15) (Miss. 2006), the evidence failed to demonstrate that the victim was the initial aggressor, making testimony concerning an altercation between the victim and the defendant several months earlier irrelevant and inadmissible. There, an eyewitness testified that Gates shot the victim after no provocation by the victim. *Id*. at 340 (¶16). Moreover, the victim himself testified to prior bad feelings between him and the defendant. *Id*. at (¶15). The supreme court found that the jury was provided sufficient information concerning the animosity between the parties such that the prior altercation resulting in their mutual filing of justice court charges was irrelevant. *Id*. at (¶16).

¶67. Dille argues as support the case of *Jordan v. State*, 211 So. 3d 713 (Miss. Ct. App. 2016), where we found reversible error when a trial court excluded testimony of prior threats and violence against Jordan's fiancé, Tanya, who was the victim's (Carter's) ex-wife. *Id*. at 714 (¶1). Jordan claimed he shot Carter in self defense because Jordan thought that Carter

was about to shoot him and Tanya. *Id*. There was conflicting testimony about how the shooting occurred, with the State and the defense presenting diametrically opposing versions of the facts. *Id*. at 714-15 (¶¶3-4). The trial court would not allow Tanya to testify about Carter's threats, physical abuse and intimidation during their marriage, separation, and divorce. *Id*. at 715 (¶6). On appeal we reversed and noted that the requirement that there be evidence of an overt act of aggression by the victim before character evidence could be allowed has been relaxed by the Mississippi Supreme Court. *Id*. at 717 (¶15) (citing *Richardson v. State*, 147 So. 3d 838, 842-43 (¶¶18-19) (Miss. 2014)). We further found that the trial court's error was not harmless because the jury heard "very little" of what was proffered in a case where the evidence was sharply conflicting. *Id*. at 718 (¶19).

¶68.    But the facts of this case are distinguishable from those in *Jordan*. In *Jordan*, the circuit court erroneously prohibited Tanya from testifying about Carter's threats to her. *Id*. at 717 (¶17). But in this case, the circuit court allowed Johnson to testify about Lacey's threats against both her and Dille. Dille's father also provided evidence of Lacey's threatening behavior. Moreover, the fact that Dille shot and killed Lacey was not in dispute. The surveillance video showed that Dille clearly exited Johnson's vehicle with a gun in his hand. Dille and Lacey exchanged words but Lacey was not armed. Dille point-blank shot Lacey as Lacey was leaning into his car, where no weapon was found. On the other hand, the jury heard extensive testimony of Dille's personal encounters with Lacey—enough to apprise them of Dille's fear. Whether that fear supported Dille's claim of shooting in self-defense was a question for the jury.

35

¶69. In contrast to *Jordan*, we recently affirmed the exclusion of character evidence in the case of *Bell v. State*, 303 So. 3d 22 (Miss. Ct. App. 2020). In that case, the victim, Nelson, drove with a friend to Westmoreland's house, where Bell was visiting. *Id*. at 25 (¶4). As Nelson approached the house, Bell opened the front door, told Nelson to "stop" and "get back," and then shot Nelson. *Id*. at (¶5). Bell continued to shoot at Nelson as Nelson ran back to the car. *Id*. at (¶6). Bell argued self-defense, claiming he had heard rumors that Nelson was the perpetrator in an unrelated murder. *Id*. at (¶7). Bell said that the victim's sister in the related murder told Bell that Nelson had killed her sister as she opened the door for Nelson. *Id*. at 26 (¶12). During Bell's testimony, the trial court would not allow him to testify about the rumor he had heard as the basis for his fear of Nelson. *Id*. at (¶12). On appeal, Bell argued that the trial court erred in excluding this testimony. *Id*. at (¶14). We disagreed and found that Bell had no first-hand knowledge of the incident between Nelson and Bridget. *Id*. at 27 (¶15). We also distinguished Bell's facts from those in *Jordan*, saying that in *Jordan* there was conflicting testimony about who initiated the conflict. *Id*. at (¶16). Moreover, the trial court allowed Bell to testify as to his state of mind in general—just not to the unrelated murder incident. *Id.*

¶70. Just as in *Bell*, the surveillance video in this case clearly shows Dille brandishing a gun and shooting Lacey, who was unarmed. Whether Lacey was reaching for a gun, leading Dille to shoot or be shot, and whether Dille acted in self-defense were questions for the jury. As in *Bell*, Dille's knowledge of the incident with Arcola was not personally known, but based on what Johnson had told him. More importantly, the jury was presented extensive

evidence of Dille's own personal experiences with Lacey through the testimony of Dille's father and Johnson to establish a basis for Dille's fear of Lacey. Thus, Dille was not prejudiced by the exclusion of testimony of the Arcola incident. Accordingly, we find no error in the exclusion of Johnson's testimony of Lacey's assault on Arcola.

**Discussion of Dille's Pro Se Issues**

¶71. After Dille's appointed appellate counsel filed her brief, Dille filed a pro se brief, raising additional issues. Although the State had Dille's pro se brief prior to filing its brief, the State did not address Dille's pro se issues. In *Jordan v. State*, 211 So. 3d 713, 716 (¶11) (Miss. Ct. App. 2016) we said that "[a]n appellee's failure to file a brief on appeal is tantamount to confession of the errors alleged by the appellant. The same rule applies where the appellee files a brief, but fails to address an issue." (citations omitted). But "automatic reversal is not required if this Court can say with confidence that the case should be affirmed." *Id*. at (¶12). Reviewing the record in this case, we are confident that we can fairly address Dille's issues despite the lack of briefing by the State.

**VI.** **Whether the circuit court erroneously denied Dille's *Batson* challenge.**

¶72. Dille contends that the circuit court erroneously denied his *Batson*[13]challenge to the State's use of its preemptory strikes during jury selection.

¶73. "When a *Batson* issue arises, the trial judge acts as the finder of fact." *Lomax v. State*, 220 So. 3d 211, 214 (¶10) (Miss. Ct. App. 2017) (quoting *Walker v. State*, 815 So. 2d 1209,

---

[13] Peremptory strikes alleged to be racially discriminatory are analyzed under *Batson v. Kentucky*, 476 U.S. 79 (1986).

1215 (¶12) (Miss. 2002)).  Appellate courts afford great deference to the trial court's findings under *Batson* "because they are largely based on credibility." *Stewart v. State*, 291 So. 3d 738, 743 (¶15) (Miss. 2020).  "A *Batson* ruling may not be overturned unless the record indicates that the ruling 'was clearly erroneous or against the overwhelming weight of the evidence.'"  *Smith v. State*, 258 So. 3d 292, 301 (¶22) (Miss. Ct. App. 2018).

¶74.   In *Batson*, the United States Supreme Court held that parties could not exercise peremptory strikes based solely on a potential juror's race.  *Eubanks v. State*, 291 So. 3d 309, 319 (¶30) (Miss. 2020) (citing *Batson*, 476 U.S. at 89).  To prevent racial discrimination in jury selection, *Batson* established a three-prong analysis, *id*., which the Mississippi Supreme Court has used:

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike.  Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror.  Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

*Stewart*, 291 So. 3d at 743 (¶16); *Hartfield v. State*, 161 So. 3d 125, 137 (¶18) (Miss. 2015) (quoting *Pitchford v. State*, 45 So. 3d 216, 224 (¶14) (Miss. 2010)).

¶75.   A defendant may establish a prima facie case of purposeful discrimination by showing that he is a member of a particular racial group and that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire.  *Wolfe v. State*, 237 So. 3d 848, 851 (¶7) (Miss. Ct. App. 2017).

¶76.   When a prima facie case has been made, the burden shifts to the prosecution to offer

race-neutral reasons for its strikes. *Corrothers v. State*, 148 So. 3d 278, 305 (¶62) (Miss. 2014). After the State articulates its reason, the defendant may then rebut the explanation to prove that it is mere pretext. *Smith*, 258 So. 3d at 301 (¶23). The trial court then makes a factual finding as to whether the prosecution engaged in purposeful discrimination. *Id*.

¶77. In *Manning v. State*, 765 So. 2d 516, 519 (¶9) (Miss. 2000), the Mississippi Supreme Court reiterated five indicia of pretext:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

Recently, the supreme court underscored that disparate treatment of similarly situated veniremen "is strong evidence of discriminatory intent." *Stewart*, 291 So. 3d at 744 (¶20) (citing *Manning*, 765 So. 2d at 520 (¶14)).

¶78. Dille asserts that *Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997), supports his argument. But in *Kolberg*, the circuit court rejected the defendant's *Batson* challenge to the State's striking black jurors because Kolberg was white without requiring the State to provide race-neutral reasons for its strikes. *Id.* at 1312 (¶23). In Dille's case, the circuit court did require the State to articulate its race-neutral reasons for striking jurors, so *Kolberg* is inapplicable.

¶79. Dille points out that the State used all ten of its preemptory strikes on black veniremen. Although the State did include three black people in its tender of the first twelve jurors, the circuit court required the State to provide the race-neutral reasons for its strikes.

39

In his brief, Dille recalls the reasons for three that he now challenges.

### A. *"Didn't get a good vibe"*

¶80.   Dille argues that it is an impermissible reason to strike a juror because the State "didn't get a good vibe" from the person.  A review of the record indicates that the State gave this explanation for the exclusion of Tanya Bragg, saying:

> And juror Tanya Bragg seemed irritated the entire time whether it was the state asking questions or the defense.  Her demeanor was just one of irritation and not comfortable being here. *So the State just didn't get a good vibe. I did not get a good vibe.*

The State clarified it meant that the attorneys did not feel comfortable with these black members it struck.[14]  The State also added that Bragg had stated she was car-jacked and had fired a gun in self-defense.  From these experiences, the State said, she would not be a good juror for the case.  We may have agreed with Dille had the State not supplemented its "lack-of-a-good vibe" reason with the more substantial experiential reason that is relevant to the self-defense issue the case.  The circuit court found this to be a race-neutral reason for Bragg's exclusion, and we agree.

### B. *Carrying a Gun*

¶81.   Dille also argues that it was impermissible for the State to exclude a black woman

---

[14] In *Manning*, 765 So. 2d at 520 (¶11), the supreme court noted that the demeanor of a potential juror would not be reflected in the record absent comment from counsel or the trial judge, which did not occur in the *Manning* case.  As a result, the prosecutor's proffered reason is neither supported nor disproved by the record.  "A trial court's determination of whether or not a reason is race-neutral largely depends on the credibility of the prosecutor. We have previously accepted a juror's demeanor as a valid race-neutral reason for a peremptory strike." *Id*. (citations omitted).

who said she carried a gun for protection, when there were also several white members who said the same thing and were not struck. Dille is probably referring to Jasmine Young, the State's second strike, who said she was a single mother and had a gun for protection, which she kept in a holster in her apartment. The State's race-neutral reason for excluding her was that "her demeanor to some of the questions - - even though her response wasn't even given, her nonverbal cues and responses were negative to the prosecution. She also stated that she carries a gun in a holster and has shown it to people in a threatening manner."[15] But although a number of prospective jurors responded that they too had guns for personal protection, including Phillip Horner, Michael Kinces, Jason Greener, Michelle Burnes, and Mona Couey, nowhere in the record is the race of these individuals indicated. Thus, we cannot determine whether Dille is correct that the State accepted other white members who said they had guns for personal protection. Additionally, the State did accept at least one black member, Robert Thomas, who also responded that he had a gun for protection. This showed that Young was not excluded only because she said she had a gun for personal protection. Thus, we cannot find that the circuit court erred in accepting the race-neutral explanation for the exclusion of Young.

C.     *Unresponsive Veniremen*

¶82.     Dille further argues that the State impermissibly struck black members because they were "unresponsive." Dille argues that there were white members who did not talk as well

---

[15] The State was incorrect in saying that Young "carries" a gun; she said she kept it in a holster in her apartment. Moreover, it was not Young, but another prospective juror, Tanya Braggs, who said she had fired her gun during an attempted carjacking.

and could be deemed "unresponsive" and that some black members who were struck were never asked a question, yet the State said they were unresponsive.

¶83.   Our review of the record shows that unresponsiveness was part of the reason the State gave for its exclusion of Jasmine Thigpen (Strike 4).  The State said:

> [S]*he was unresponsive to any of the questions with the state.*  She failed to engage in any of the answering.  We felt like this was by design to not participate, and we felt that because of her lack of participation that she would not be a qualified juror for the state, and we felt the same way on S-5, Your Honor, that she was also inattentive and non-responsive.

The State said that no one at its table had written any notes about the person it struck as S-4.[16]

¶84.   A review of the voir dire shows that every potential juror, except Porsha Harrison and Ora Allen, answered some substantive question.  Although the State accepted both Harrison and Allen, the record does not reflect their race.  If they were white, then the State's acceptance of them but rejection of Thigpen could have formed a basis for a *Batson* challenge.  But not knowing the race of Harrison or Allen, we cannot find any merit to Dille's claim that they were excluded based on race.

¶85.   In summary, we find no merit to the three *Batson* challenges that Dille raises either because the circuit court correctly found a race-neutral reason for a potential juror's exclusion or because the record does not indicate the race of the persons the State did not exclude.

---

[16] Again, the State was incorrect with respect to Thigpen.  In fact, Thigpen did respond to the question about whether people should be able to defend themselves if a child is present.  She said, "I think in a situation like that I think a person should be able to defend themselves and try to protect themselves and the child."

**VII. Whether the circuit court erred in denying Dille's motion to strike the surrogate medical examiner's testimony.**

¶86. Dille next contends that the circuit court improperly allowed Dr. LeVaughn to testify when he had not performed Lacey's autopsy. At the time of the trial, Dr. Lisa Fuente, who had performed the autopsy, was no longer employed by the medical examiner's office and was living in Maine. Dille argued that because she was still living in the United States, she was available to be subpoenaed, and he was deprived of his Sixth Amendment right to confront witnesses if she did not testify. We disagree.

¶87. We dealt with this same issue in *Fairley v. State*, 251 So. 3d 761 (Miss. Ct. App. 2018). There, Fairley shot and killed his cousin, Mark, in the parking lot of a shaved-ice stand. *Id*. at 763 (¶2). The two had argued and went to their vehicles. *Id*. at (¶3). After backing out, Mark got out of his vehicle and started to argue with Fairley again. *Id*. Fairley reached into his vehicle, pulled out a gun, and shot Mark several times. *Id*. Dr. Erin Barnhardt of the State Medical Examiner's Office performed Mark's autopsy, but she no longer worked there at the time of the trial; so Dr. LeVaughn testified. *Id*. at 764 (¶8). On appeal of his conviction, Fairley raised the denial of his Sixth Amendment right to confront witnesses against him when Dr. LeVaughn and not Barnhardt testified. *Id*. We found no error in Dr. LeVaughn's testifying, saying:

> [T]he Mississippi Supreme Court has held that, "by contrast, when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness's testimony does not violate a defendant's Sixth Amendment rights."

*Fairley*, 251 So. 3d at 764 (¶11) (quoting *McGowen v. State*, 859 So. 2d 320, 339 (¶68)

43

(Miss. 2003). We also cited *Christian v. State*, 207 So. 3d 1207, 1213 (¶21) (Miss. 2016), another case where the doctor who actually performed an autopsy did not testify, but instead another expert from the medical examiner's office testified. The Mississippi Supreme Court found that the testifying doctor examined the autopsy, photographs, and case notes and concluded that the victims had died of gunshot wounds. *Id.* The supreme court ultimately concluded that the testifying doctor's testimony was proper. *Id*. at 1213-14 (¶¶26-27).

¶88. Dille raises *Goforth v. State*, 70 So. 3d 174 (Miss. 2011), to support his argument. But his facts and those of *Goforth* are radically different. In *Goforth*, the circuit court had admitted a prior statement given by a witness because the witness had been in a subsequent automobile accident that left him mentally and physically impaired. *Id*. at 182 (¶38). Dille's challenge in this case is not to lay-witness testimony but to a medical expert who had reviewed the entire autopsy report and personally signed off on it. Following our holding in *Fairley*, we find no error in the circuit court's ruling allowing Dr. LeVaughn to testify.

**VIII. Whether Dille was denied his constitutional right to a speedy trial.**

¶89. Dille argues that he was denied his constitutional right to a speedy trial.[17] Soon after his indictment, Dille's counsel filed a motion for a speedy trial to obtain a trial date. As

---

[17] Dille does not argue that he was denied his statutory right to a speedy trial as found in Mississippi Code Annotated section 99-17-1 (Rev. 2015): "Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Dille makes only passing reference to the statutory right to a speedy trial when he deals with the dismissal of the accused as a remedy and cites a case. Accordingly, we decline to address whether the State violated Dille's statutory right to a speedy trial. *Graham v. State*, 185 So. 3d 992, 1005 (¶38) (Miss. 2016).

44

noted below, a trial date was secured, but several continuances were granted after an unexplained hiatus. Notably, Dille did not raise the lack-of-a-speedy-trial issue in his post-trial motion.[18] For us to consider Dille's argument for reversal, we must first find plain error. "[W]hen a defendant presents such a claim [(i.e., violation of a constitutional right to a speedy trial)] for the first time on appeal, the error must rise to the level of plain error, meaning the defendant's fundamental right was violated." *Johnson v. State*, 235 So. 3d 1404, 1416 (¶42) (citing *Dora v. State*, 986 So. 2d 917, 924 (¶15) (Miss. 2008)).

¶90.    To determine whether Dille was denied his constitutional right to a speedy trial, we apply a four-part test established by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Wilson v.* State, 276 So. 3d 1241, 1258-59 (¶44) (Miss. Ct. App. 2018). "Within the framework of plain-error review, the *Barker* factors are: the 'length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *Johnson*, 235 So. 3d at 1416 (¶43) (quoting *Barker*, 407 U.S. at 530). But "no single factor is necessary or sufficient on its own to find a deprivation of the right to a speedy trial, and that all factors must be considered alongside other relevant circumstances." *Graham*, 185 So. 3d at 1005 (¶39).

¶91.    The following are pertinent dates from the record of this case:

---

[18] Usually, failure to raise an issue in a motion for a JNOV or a new trial procedurally bars appellate review of that issue. *Boyda v. State*, 57 So. 3d 61, 67 (¶24) (Miss. Ct. App. 2011); *Watts v. State*, 492 So. 2d 1281, 1290-91 (Miss. 1986). But "[a] review under the plain error doctrine is necessary when a party's fundamental rights are affected, and the error results in a manifest miscarriage of justice." *Johnson v. State*, 235 So. 3d 1404, 1414 (¶31) (Miss. 2017) (citing *McGee v. State*, 953 So. 2d 211, 215 (¶8) (Miss. 2007)).

| | |
|---|---|
| February 18, 2014 | Arrest; |
| April 24, 2014 | Indictment; |
| June 20, 2014 | Dille's motion for discovery and speedy trial; |
| June 30, 2014 | Arraignment (trial set for December 8, 2014); |
| October 20, 2014 | Agreed order continuing trial because Dille's attorney was leaving the public defender's office, and his new attorney was unknown; |
| May 6, 2016 | Dille's motion to compel discovery; |
| May 9, 2016 | Dille's motion to compel 911 tape (motion dated April 4, 2016, but not electronically filed until May 9, 2016); |
| May 13, 2016 | Dille's motion to continue trial from May 13, 2016, because defense counsel had only recently received contact information for one of the State's main witnesses and because defense counsel had the number one case in the trial line-up and was preparing for that case |
| May 16, 2016 | Dille's motion for bail; |
| May 18, 2016 | Dille's motion for funds for expert; |
| June 21, 2016 | Dille's motion for continuance from July 25, 2016 trial setting based on "obtaining funding for expert"; |
| June 28, 2016 | Dille's motion for production of cell phones; |
| December 22, 2016 | Agreed order continuing trial from December 13, 2016, to "next term"; |
| August 23. 2017 | Agreed order continuing the trial (set for September 5, 2017) because defense counsel would be on paternity leave; |
| October 5, 2017 | Scheduling order setting trial date for June 11, 2018; |
| June 11, 2018 | First trial; |

July 17, 2018     Scheduling order setting retrial date for November 13, 2018;

October 22, 2018    Dille's motion to continue to give defense counsel additional time to review trial transcript;

November 20, 2018   Amended order setting trial date for April 8, 2019; and

April 9, 2019     Second trial.

### A. Length of Delay

¶92. The constitutional right to a speedy trial begins at the time of the indictment or the time of arrest if the defendant is held pending criminal charges. *Kelly v. State*, 305 So. 3d 1134, 1140 (¶13) (Miss. 2020); *Johnson*, 235 So. 3d at 1417 (¶45). "In Mississippi, eight months [or more] of delay presumptively prejudice[s] the defendant, at which point the reviewing court must carry out a full *Barker* analysis." *Graham*, 185 So. 3d at 1005 (¶40). In this case, Dille was arrested on February 18, 2014, and not tried until June 11, 2018, a delay of 1,574 days. This factor weighs in Dille's favor.

### B. Reason for the Delay

¶93. "Once a presumption of prejudice is shown, the burden of persuasion must shift to the State to show good reason for the delay . . . [and] show that either the delay was caused by the defendant or that the delay was for a good cause." *Kelly*, 305 So. 3d at 1140 (¶14) (citations and internal quotations omitted). In this case, the record after May 2016 indicates several legitimate reasons for his trial's delay, including three continuances initiated by Dille, and two orders continuing the case, to which Dille agreed. At times, the trial was delayed to accommodate defense counsel. Dille argues that the delay was caused in part by the State, which did not produce the 911 recordings, requiring defense counsel to file a motion to

47

compel to obtain them. But the motion to compel these 911 recordings was filed on May 11, 2018, just one month before Dille's trial. There was little if any delay in the trial date caused by the failure of the State to produce the recordings.

¶94. We do note gaps at certain times between May 2016 and Dille's first trial in June 2018, but in *Kelly*, the Mississippi Supreme Court held that under the totality of the circumstances, a delay of three years between indictment and trial did not violate a defendant's right to a speedy trial. *Kelly*, 305 So. 3d at 1142 (¶25). Accordingly, we find that the delay in this time period did not violate Dille's right to a speedy trial.

¶95. But we find it disconcerting that there is nothing in the record to explain the inactivity in this case between October 2014 and May 6, 2016. Dille was arrested on February 18, 2014, and although his case was initially set for trial in December 2014, after October 20, 2014, there is no activity until May 6, 2016 (564 days later). We cannot discern what happened during this time. The Mississippi Supreme Court faced a similar situation in *Johnson* where the record was void as to the reasons for a nine-month delay between the accused's arrest and his indictment. *Johnson*, 235 So. 3d at 1417 (¶46). The court said:

> Here, the State admits that the record is void as to why there is more than a nine-month delay in the time between Johnson's arrest and his indictment. However, because Johnson never brought up this issue in the trial court, the State was never on notice to explain such delay on the record.

*Id*. Similarly, Dille never brought up the issue in his case either. In May 2016, his counsel filed several motions (a motion to compel text messages and Johnson's current phone number and address; motion to compel the 911 recording, motion for continuance, and motion to set bail). But Dille filed no motion to dismiss due to the lack of a speedy trial. Had he done so,

48

the record would have contained the State's explanation for the delay, and the circuit court would have been able to rule on those reasons. Accordingly, we cannot weigh the reasons for the delay between October 2014 and May 2016 against the State nor do we weigh this factor in favor of Dille.

### C.     *Assertion of the Right to a Speedy Trial*

¶96.     The *Barker* factor concerning the defendant's assertion of his right to a speedy trial refers to a timely assertion in the trial court. An assertion of the right to a speedy trial is the demand for a speedy trial made by a defendant. "At the very least, a defendant's assertion of his speedy trial rights should manifest 'his desire to be tried promptly.'" *Franklin v. State*, 136 So. 3d 1021, 1035 (¶55) (Miss. 2014) (quoting *United States v. Frye*, 489 F.3d 201, 211-12 (5th Cir. 2007)). In this case, Dille asserted his right to a speedy trial early in the case in his June 20, 2014 motion for discovery, a speedy trial, and a plea offer. Because Dille did assert his right to a speedy trial, we will weigh this *Barker* factor in his favor. But we also temper the weight we give because Dille never brought the issue to the circuit court's attention thereafter, when the State could have given the reason for the delay.

### D.     *Prejudice to the Defendant*

¶97.     In order for this Court to determine whether the delay prejudiced Dille, we must consider three interests: "(1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Kelly*, 305 So. 3d at 1141 (¶21) (quoting *Johnson*, 235 So. 3d at 1418 (¶49). The most serious interest to be considered is whether the delay impaired the defense. *Id.*

49

¶98.	Although Dille claims prejudice because he lost his job and his relationship with Johnson, he primarily argues that the delay impaired his defense in several ways. First, he says that at his preliminary hearing, Attorney Lynn Watkins acknowledged there was a 911 call in January 2014. Dille implies that this 911 call recording was lost by the time of his trial. But there is no transcript in the record of any testimony taken at Dille's preliminary hearing for us to confirm what Dille claims. More importantly, there is no mention anywhere in the record of a 911 call in January 2014 or its importance to the defense. Dille's May 9, 2016 "Motion to Compel 9-1-1 Recording" refers to a 911 call made earlier in the afternoon of the day of the shooting, February 18, 2014. Because there is nothing in the record to prove that this alleged 911 call in January 2014 was in any way exculpatory or relevant to Dille's case, we find that the delay in his trial did not impair Dille's defense due to the lack of evidence of said call.

¶99.	Next, Dille claims that the delay caused his defense counsel to be unable to locate "911 responding officers" for trial, such as Timothy Hudson. Hudson was one of the officers who responded to the dispatch on February 18, 2014, and who came to the scene of the shooting.[19] Dille makes no showing of what Hudson would testify to or how that testimony would have been exculpatory. We find no impairment in Dille's defense by his attorney's alleged inability to locate Hudson or the lack of Hudson's testimony.

¶100.	Dille also claims that his defense was impaired by the delay because Dr. Lisa Fuente,

---

[19] In the first trial, Officer Natalie Luckett testified that Hudson was one of the JPD officers who responded on the night of the shooting.

the doctor who performed Lacey's autopsy, had moved out of state and did not testify at trial. But we have already held that her supervisor, Dr. LeVaughn, was properly allowed to testify in her stead. Dille provides no evidence that Dr. Fuente's testimony would have differed from Dr. LeVaughn's testimony. Accordingly, we find that the delay did not impair Dille's defense by Fuente's relocation in the interim.[20]

¶101. Dille also claims exculpatory evidence, i.e., text messages from cell phones confiscated at the scene of the shooting, were not preserved for trial and attributes this to the delay in his trial. The record shows that the State did provide Dille's counsel with the text messages from the phones, but there were no messages after 2013. Thus, the State had preserved the messages; they were just not relevant to the case, nor are they relevant to the issue of the delay of Dille's trial.

¶102. In reviewing Dille's claims that the delay impaired his defense, we find none with merit. At both of Dille's trials, Dille was able to present evidence to support his claim of self-defense. No evidence was lost between the date of his arrest and the dates of his trials. No key witness died. The delay in finally trying the case did not affect Dille's ability to defend himself. Accordingly, this *Barker* factor weighs heavily against Dille.

¶103. In sum, weighing the *Barker* factors, we find that although Dille asserted his right to a speedy trial, and there was delay in that trial occurring, Dille was not prejudiced by the

---

[20] Dille also claims that the delay impeded his defense because "since August 2020, JPD Officer Lincoln Lampley has been indicted under second degree murder." But a trial earlier than 2018 or 2019 would pre-date Dille's allegation of charges against Lampley. Any charges against Lampley now are irrelevant to the issue of a delay in Dille's trial.

delay.  Accordingly, we do not find plain error in Dille's claim for a denial of his constitutional right to a speedy trial.

### IX. Whether the circuit court erroneously suppressed Lacey's toxicology report.

¶104. Dille claims that the circuit court erroneously suppressed Lacey's toxicology report. In Dille's first trial, the State filed a motion in limine to exclude the toxicology results from Lacey's autopsy, which showed that Lacey had barbituates and THC (marijuana) in his blood.  There was no ruling by the court on this motion in the record, but neither party questioned Dr. LeVaughn in the first trial about the toxicology report.  More importantly, neither the State nor Dille raised the toxicology report in any motion in limine or questioning of witnesses in Dille's second trial.  It is the circuit court's rulings in the second trial that we are reviewing in this appeal.  Since there was no ruling by the circuit court on the admission of Lacey's toxicology report in Dille's second trial, there is nothing for Dille to raise as error. In addition, this issue was not raised in Dille's motion for a JNOV or a new trial, procedurally barring him from raising it on appeal.  Failure to raise an issue in a motion for a JNOV or a new trial procedurally bars appellate review of that issue.  *Boyda*, 57 So. 3d at 67 (¶24); *Watts*, 492 So. 2d at 1290-91.

### X. Whether statements by the State constituted prosecutorial misconduct.

¶105. Dille also contends that the circuit court erred in allowing prejudicial, "send-a-message" arguments by the State during closing.  He claims that the State's urging the jury to "do the right thing" and to "make the right decision" was an improper "send-a-message"

argument. But Dille did not contemporaneously object to the State's argument at trial and would be procedurally barred from raising the issue on appeal. *See Matthews v. State*, 132 So. 3d 646, 653 (¶30) (Miss. Ct. App. 2014) (finding defendant's failure to object contemporaneously to prosecutor's comments during closing argument waived the issue on appeal).

¶106. "However, even in the absence of a contemporaneous objection, we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." *Miskell v. State*, 270 So. 3d 23, 35 (¶43) (Miss. Ct. App. 2018). "A 'send the message' argument is one that encourages juries to use their verdict to send-a-message to the public or to other potential criminals, instead of rendering a verdict based solely on the evidence introduced at the trial of that case." *Coleman v. State*, 289 So. 3d 1221, 1225 (¶11) (Miss. Ct. App. 2020). "The trial judge should intervene to prevent unfair argument only when counsel "departs entirely from the evidence[,] . . . makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence." *Id.* at 1224 (¶9).

¶107. In this case, the prosecutor addressed the jury:

> I want you to weigh the facts. I want you to do just what I asked you to do in voir dire. I want you to be reasonable, rational people. Set your emotions aside. *Do the right thing*. Listen to the law. Listen to the facts.

(Emphasis added). And later, the prosecutor said:

> We want you to listen to the facts, watch the video, make up your mind as to what happened, read the law, *make the right decision*. That's what we

ask.

(Emphasis added). Reading these statements in context, it is clear that the prosecutor was not asking the jury to divorce themselves from the proof, but instead, to evaluate it, whatever the outcome. The comments were not inflammatory or misstatements of fact, nor can we say they were designed to excite the passion of the jury. Accordingly, we find no prosecutorial misconduct during the State's closing argument.

### XI. Whether the State failed to prove all elements of first-degree murder.

¶108. Dille argues that the State failed to prove all elements of the crime of first-degree murder. In his brief, Dille argues the facts he contends are favorable to him, including that he was the victim of domestic violence and that Lacey's confronting him constituted a breach of the peace bond. But Dille cites no legal authority to support his argument. Failure to cite any authority procedurally bars this issue from consideration by this Court. *Hale v. State*, 191 So. 3d 719, 728 (¶26) (Miss. 2016) (citing *Rubenstein v. State*, 941 So. 2d 735, 780 (¶196) (Miss. 2006); *Bell v. State*, 879 So. 2d 423, 434 (¶28) (Miss. 2004)). Procedural bar notwithstanding, this argument is without merit.

¶109. "Due Process requires that the State prove each element of the offense beyond a reasonable doubt." *Jones v. State*, 991 So. 2d 629, 635 (¶15) (Miss. Ct. App. 2008). "In determining whether the evidence is sufficient, the relevant question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McDowell v. State*, 311 So. 3d 1252, 1259 (¶16) (Miss. Ct. App. 2021) (citing *Calloway v. State*, 281 So. 3d 909, 914 (¶16) (Miss. Ct. App. 2019)). "We will reverse a conviction only

where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *McDowell*, 311 So. 3d at 1260 (¶21). In our analysis, we review the evidence in the light most favorable to the prosecution. *Cooper v. State*, 230 So. 3d 1071, 1081 (¶35) (Miss. Ct. App. 2017).

¶110. In this case, the circuit court instructed the jury on deliberate-design murder, depraved- heart murder, heat-of-passion manslaughter, shooting into an occupied vehicle, and self-defense. To convict Dille of first-degree murder, the State was required to prove beyond a reasonable doubt that Dille acted with deliberate design. *See* Miss. Code Ann. § 97-3-19(1)(a). To assist the jury, the circuit court instructed them on the definition of the words "deliberate" and "design." Another element of "deliberate design" murder requires proof that Dille did not act in self-defense.

¶111. Evidence in this case showed that although Dille had secured a peace bond against Lacey, Dille still decided to accompany Johnson to the gas station to pick up her child. The surveillance video captured the incident and showed Dille exiting Johnson's vehicle, gun in hand. Although Dille started walking to the store, he turned and engaged in conversation with Lacey. Dille then suddenly ran up to Lacey, brandishing his gun. Although Dille retreated, as Lacey was leaning into his car, Dille shot him eight times. The video showed that Lacey was unarmed, and the police search of Lacey, Lacey's car, and the immediate area confirmed that Lacey had no gun.

¶112. While Dille could argue that his riding to the rendezvous with a gun demonstrated his

fear of Lacey, it could also be argued that Dille anticipated and prepared for violence. He chose to exit the Johnson vehicle when he could have remained in the car. Moreover, he exited the vehicle with the gun in his hand (not in a holster, not in his pocket, but in his hand). From this, a jury could conclude that Dille planned to kill Lacey. The video also shows Dille running up to Lacey and pointing the gun at him. From this, the jury could rationally conclude that Dille was the aggressor in the confrontation. A reasonable juror could feel that Lacey's turning into his vehicle was not an act of aggression, although Dille argued that Lacey may have been reaching for a gun. Before Dille could determine if he was really in danger of being shot, Dille shot Lacey.

¶113. Under these facts, a reasonable trier of fact could conclude that Dille's arrival to the scene, openly armed, along with the ensuing events, showed Dille acted with deliberate design. Thus, Dille's claim that the State failed to prove the elements of murder has no merit.

### XII. Whether there was overwhelming evidence of justifiable homicide.

¶114. Dille claims that the jury, which was duly instructed on justifiable homicide, should have found him not guilty given the evidence presented. Dille argues the facts but again cites no legal authority to support his claim of error. He contends that Lacey parked his vehicle, blocking Johnson's vehicle; that Lacey began the confrontation/verbal exchange with Dille; and that from prior confrontations with Lacey, Dille was fearful to the point where he had purchased a gun and obtained a peace bond. But these facts do not constitute "overwhelming evidence" of justifiable homicide for us to reverse the jury's findings.

¶115. "Self defense or justifiable homicide is a defense to a criminal act." *McDowell*, 311 So. 3d at 1263 (¶32) (citing *Brown v. State*, 222 So. 3d 302, 307 (¶20) (Miss. 2017)). But whether Dille acted in self-defense, justifying his shooting Lacey, was a question for the jury to decide. *Davis v. State*, 158 So. 3d 1190, 1194 (¶15) (Miss. Ct. App. 2015). "Where the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict." *Birge v. State*, 216 So. 3d 1174, 1178 (¶18) (Miss. Ct. App. 2017). "A successful self-defense argument requires that the jury believe that it was objectively reasonable for the defendant to believe he was in danger of imminent death or serious bodily harm." *Id*. (quoting *Wilder v. State*, 118 So. 3d 628, 631 (¶9) (Miss. Ct. App. 2012)). "We will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Birge*, 216 So. 3d at 1178 (¶17).

¶116. Viewing all the evidence in a light most favorable to the verdict, we cannot conclude that the evidence of self-defense in this case was so overwhelming that the jury's verdict should be set aside. As previously stated, the jury saw the video of the shooting, which clearly showed Dille with a gun, threatening and ultimately shooting Lacey. It was for the jury, not us, to weigh this evidence against Lacey's prior threats on Dille, who claims that he obtained the gun for protection. The jury's finding that Dille was guilty of murder necessarily included a finding that he did not act in self-defense, i.e., that the homicide was not justifiable. Therefore, we do not find that allowing the jury's verdict to stand creates an unconscionable injustice and we find this issue of Dille's meritless.

### XIII.   Whether Dille was received ineffective assistance of counsel.

¶117.   Dille also raises as an issue that "[t]he defense failed to summon Detective Nashata Lucket who interviewed Dille and Rosemary Johnson on Feb. 18, 2014."  Dille claims that this failure by his attorneys constituted ineffective assistance, which deprived him of his Sixth Amendment right to counsel.

¶118.   Claims of ineffective assistance of counsel are generally more appropriately brought during post-conviction proceedings.  *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020).  "This Court will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*.  An appellate court may also "resolve ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id*.

¶119.   In this case, the parties have not stipulated that the record is adequate for us to evaluate Dille's claim.  Nor can we say that the record before us now affirmatively shows "ineffectiveness of constitutional dimensions" or lack of merit to Dille's claim.  Accordingly, we make no ruling on the issue of ineffective assistance of counsel, which Dille may bring in the future in a motion for post-conviction relief.  At such time, the circuit court may evaluate whether Dille can prove such a claim from the affidavits or testimony Dille presents.

### Conclusion

¶120.   For the above reasons, we find no reversible error by the circuit court in Dille's case.

58

¶121.  **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**